

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
### FORT WORTH

### NO. 02-11-00374-CV

IN THE INTEREST OF N.B.B.C.
AND J.A.A.J., CHILDREN

----------

FROM THE 323RD DISTRICT COURT OF TARRANT COUNTY

----------

## MEMORANDUM OPINION[1]

----------

Appellant D.J. (Mother) appeals the termination of her parental rights to her children N.B.B.C. ("Nicolas") and J.A.A.J. ("Jane").[2]  We will affirm the trial court's judgment.

---

[1]*See* Tex. R. App. P. 47.4.

[2]We use aliases for the children throughout this opinion.  *See* Tex. R. App. P. 9.8(b)(2).

## Background Facts

Mother first became involved with Child Protective Services (CPS) in 2004, when she was using methamphetamine while caring for her oldest child.[3] The child was taken from Mother and placed with Mother's mother (Grandmother). In 2005, while Mother was pregnant with Nicolas, she was committed to a psychiatric hospital, where she testified she received antidepressants and antipsychotics. When Nicolas was born, he tested positive for barbiturates and tricyclics. Nicolas was also placed with Grandmother. At some point, Mother took Nicolas back. He was in her care in late 2006 when Mother tested positive for methamphetamine. CPS took Nicolas and placed him with a foster family, where he remained for about nine months.

In late 2006 or early 2007, Mother, who was two months pregnant with Jane, was arrested for unauthorized use of a motor vehicle. She received probation for three years. Mother testified that after Nicolas was removed she worked on her substance-abuse issues for twenty-four months. When she was seven months pregnant with Jane, Mother voluntarily checked herself into a thirty-day inpatient rehab program "to get [Nicolas] back and to keep them from terminating" her rights to Jane. CPS returned Nicolas to Mother in 2008, did not seek to take custody of Jane, and closed its case.

---

[3]Mother's oldest child was not the subject of this case, and Mother retains joint custody of him.

In August 2009, CPS was notified by Mother's probation officer that she had failed four court-ordered drug tests in a row, testing positive for methamphetamines. CPS filed its "Petition for Protection of Children, For Conservatorship, and for Termination in Suit Affecting Parent-Child Relationship" on September 14, 2009. Temporary orders were entered on October 16, 2009, appointing CPS as temporary managing conservator of the children. Mother's probation was revoked and she was incarcerated in state jail for nine months. While in jail, Mother completed "all kinds" of programs. In February 2011, after Mother was released, CPS moved for, and the trial court granted, monitored return of the children. In June, a hair follicle drug test returned positive for methamphetamine and amphetamine. CPS took the children back into care and pursued termination of Mother's parental rights as well as termination of the rights of the alleged biological fathers and any unknown fathers.[4]

After a trial to the bench, the trial court found that Mother had knowingly placed or knowingly allowed her children to remain in conditions or surroundings that endangered the physical or emotional well-being of the children; engaged in conduct or knowingly placed the children with persons who engaged in conduct that endangered the physical or emotional well-being of the children; and that

---

[4]The trial court terminated the rights of the purported fathers of the children after trial. The fathers are not parties to this appeal.

3

termination of Mother's parental rights was in the children's best interest.[5]  This appeal followed.

## Standard of Review

A parent's rights to "the companionship, care, custody, and management" of his or her children are constitutional interests "far more precious than any property right."  *Santosky v. Kramer*, 455 U.S. 745, 758–59, 102 S. Ct. 1388, 1397 (1982); *In re M.S.*, 115 S.W.3d 534, 547 (Tex. 2003).  In a termination case, the State seeks not just to limit parental rights but to erase them permanently—to divest the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except for the child's right to inherit. Tex. Fam. Code Ann. § 161.206(b) (West 2008); *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985).  We strictly scrutinize termination proceedings and strictly construe involuntary termination statutes in favor of the parent.  *Holick*, 685 S.W.2d at 20–21; *In re R.R.*, 294 S.W.3d 213, 233 (Tex. App.—Fort Worth 2009, no pet.).

In proceedings to terminate the parent-child relationship brought under section 161.001 of the family code, the petitioner must establish one ground listed under subsection (1) of the statute and must also prove that termination is in the best interest of the child.  Tex. Fam. Code Ann. § 161.001; *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005).  Both elements must be established; termination may

---

[5]*See* Tex. Fam. Code Ann. § 161.001 (West Supp. 2011).

not be based solely on the best interest of the child as determined by the trier of fact. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *In re D.T.*, 34 S.W.3d 625, 629 (Tex. App.—Fort Worth 2000, pet. denied).

Termination decisions must be supported by clear and convincing evidence. Tex. Fam. Code Ann. § 161.001; *see also id.* § 161.206(a) (West 2008). Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* § 101.007 (West 2008). Due process demands this heightened standard because termination results in permanent, irrevocable changes for the parent and child. *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002); *see In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007) (contrasting standards for termination and modification).

In evaluating the evidence for legal sufficiency in parental termination cases, we determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction that the grounds for termination were proven. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). We review all the evidence in the light most favorable to the finding and judgment. *Id.* We resolve any disputed facts in favor of the finding if a reasonable factfinder could have done so. *Id.* We disregard all evidence that a reasonable factfinder could have disbelieved. *Id.* We consider undisputed evidence even if it is contrary to the finding. *Id.* That is, we consider evidence favorable to termination if a

reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *Id.*

We cannot weigh witness credibility issues that depend on the appearance and demeanor of the witnesses, for that is the factfinder's province. *Id.* at 573, 574. And even when credibility issues appear in the appellate record, we defer to the factfinder's determinations as long as they are not unreasonable. *Id.* at 573.

In reviewing the evidence for factual sufficiency, we give due deference to the factfinder's findings and do not supplant the judgment with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We determine whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that the parent violated subsections (D) and (E) of section 161.001(1) and that the termination of the parent-child relationship would be in the best interest of the child. Tex. Fam. Code Ann. § 161.001; *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction in the truth of its finding, then the evidence is factually insufficient. *H.R.M.*, 209 S.W.3d at 108.

**Discussion**

**I. Grounds for termination**

In Mother's first and second issues, she challenges the legal and factual sufficiency of the evidence to support the trial court's findings under subsections

6

(D) and (E) of section 161.001(1) of the family code. Since the evidence pertaining to subsections 161.001(D) and (E) is so interrelated, we will consolidate our review. *In re S.D.*, 980 S.W.2d 758, 762 (Tex. App.—San Antonio 1998, pet. denied)*; In re B.R.*, 822 S.W.2d 103, 106 (Tex. App.—Tyler 1991, writ denied) (recognizing the link between a parent's conduct and a child's conditions and surroundings).

"Endanger" means to expose to loss or injury, to jeopardize. *Boyd*, 727 S.W.2d at 533; *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.). Under subsection (D), it is necessary to examine evidence related to the environment of the children to determine if the environment was the source of endangerment to the children's physical or emotional well-being. *J.T.G.*, 121 S.W.3d at 125. Conduct of a parent in the home can create an environment that endangers the physical and emotional well-being of a child. *In re W.S.*, 899 S.W.2d 772, 776 (Tex. App.—Fort Worth 1995, no writ). For example, abusive or violent conduct by a parent or other resident of a child's home may produce an environment that endangers the physical or emotional well-being of a child. *See id.* at 776–77; *Ziegler v. Tarrant Cnty. Child Welfare Unit*, 680 S.W.2d 674, 678 (Tex. App.—Fort Worth 1984, writ ref'd n.r.e.). Parental and caregiver illegal drug use and drug-related criminal activity likewise supports the conclusion that the children's surroundings endanger their physical or emotional well-being. *See S.D.*, 980 S.W.2d at 763.

7

Under (E), the relevant inquiry is whether evidence exists that the endangerment of the children's physical well-being was the direct result of the parent's conduct, including acts, omissions, or failures to act. *See J.T.G.*, 121 S.W.3d at 125; *see also* Tex. Fam. Code Ann. § 161.001(1)(E). Additionally, termination under (E) must be based on more than a single act or omission; the statute requires a voluntary, deliberate, and conscious course of conduct by the parent. *J.T.G.*, 121 S.W.3d at 125; *see* Tex. Fam. Code Ann. § 161.001(1)(E). It is not necessary, however, that the parent's conduct be directed at the children or that the children actually suffer injury. *Boyd*, 727 S.W.2d at 533; *J.T.G.*, 121 S.W.3d at 125. The specific danger to the children's well-being may be inferred from parental misconduct standing alone. *Boyd*, 727 S.W.2d at 533; *In re R.W.*, 129 S.W.3d 732, 738 (Tex. App.—Fort Worth 2004, pet. denied). To determine whether termination is necessary, courts may look to parental conduct occurring both before and after the children's birth. *In re D.M.*, 58 S.W.3d 801, 812 (Tex. App.—Fort Worth 2001, no pet.).

Mother argues that she had done much to comply with her service plan, such as obtaining stable housing. However, Mother testified that by the time of trial, she no longer had stable housing and did not know where she would take her children that night if they were returned to her. *See In re T.S.*, No. 02-10-00089-CV, 2010 WL 4486332, at *8 (Tex. App.—Fort Worth Nov. 10, 2010, no pet.) (mem. op.) (upholding finding of endangerment when father was, among other things, unable to provide stable housing and financially unable to care for

8

his children). She admitted, "I have no way to take care of them and nowhere to take them." She was unemployed with little prospect for employment. She had dropped out of high school and had a felony conviction. She had no transportation and was staying with friends. She testified further that she did not know what school Nicolas would attend if the children were returned to her. When asked whether she believed that she could provide a safe environment for the children, she said, "After all this stuff y'all have said, I don't think I can." When asked about her plans to secure a job and transportation, she testified, "Really, right this second, I don't know. I've kind of been waiting on this to see what I'm going to do."

She admitted that she used drugs while the children were in her custody, but denied using drugs in their presence. She admitted that using drugs while having custody of her children was not a good parenting decision. Mother's probation officer, Krystal Henson, testified that Mother failed six drug tests from August through December 2009. Mother also admitted twice in August 2009, that she had done drugs. Henson testified that when she was transferred to Mother's case in July 2009, Mother missed three drug tests. Henson testified that missing drug tests is an indication that the person is doing drugs again. Henson directed Mother to attend an intensive day treatment program. When Mother failed to go, a motion to revoke probation was filed.

Henson testified that she did not think Mother took her probation seriously, pointing to the fact that Mother missed drug tests and appointments with her

probation officer. Henson also testified that Mother had given the wrong address for her apartment building. When Henson questioned Mother about it, Mother asked Henson to write down Mother's address for her. Henson confirmed that her concern that Mother was unable to care for her children was the reason that she had called CPS.

Mother was unable to get the children to daycare on time (even though it was within walking distance), often arriving two hours late. During the monitored return, Mother's CPS caseworker, Ashley Brooks, testified that Nicolas told her he had trouble waking Mother up in the morning. Brooks spoke to Mother about getting the children to school on time. Mother improved for a time, but reverted to being late.

Mother testified at trial that during the summer of 2011, she felt she was "on the verge of a relapse" and called her therapist, who suggested she call MHMR and get back on antidepressants. Claiming that she had not liked the way the drugs affected her, she put off getting help. Mother decided that she had "already kind of screwed up" and, thinking that she was going to lose her children, started keeping the children out of daycare to spend time with them.[6] Mother admitted that she did not pursue help for her mental state "like they wanted me to." She also acknowledged that she knew CPS was requiring

_____

[6]CPS paid for protective child care for the children from 9:00 a.m. to 3:00 p.m. each weekday while the children were on monitored return to Mother. The daycare also served as a Pre-K school for Nicolas.

sobriety as a condition of the return of her children, but that she did not want to go into drug treatment.

Mother's history with drug abuse goes back at least seven years. Although Mother argues that she has been drug free for the past five months, she has claimed a number of periods of sobriety only to relapse. Although Mother acknowledges her responsibility for her actions, it appears that she has yet to overcome her addiction. The trial court could have believed that there was a serious concern that Mother would relapse back into drug addiction. *See In re J.D.B.*, No. 02-06-00451-CV, 2007 WL 2216612, at *3 (Tex. App.—Fort Worth Aug. 2, 2007, no pet.) (mem. op.) (noting that a factfinder may infer that past conduct endangering the well-being of a child may recur in the future if the child is returned to the parent); *In re C.S.C.*, No. 02-06-00254-CV, 2006 WL 3438185, at *7 (Tex. App.—Fort Worth Nov. 30, 2006, no pet.) (mem. op.) (same).

When Brooks questioned Mother about her failed drug test in June 2011, Mother repeatedly denied any drug use and told Brooks that she heard "you can have sex with somebody and then test positive that way." Mother admitted that she did not tell CPS that she was sometimes living with a friend ("Joe," one of the men Mother listed as the possible father of Jane) because she did not want CPS to require him to work services because she believed he was not willing to participate. She acknowledged that it would have been helpful to have Joe demonstrate his ability to care for Jane, but "he is not capable of it."

11

When CPS arrived at Mother's house to remove the children in June 2011, a man was in the apartment. Brooks asked who he was, but Mother instructed him not to respond. Mother told Brooks that her electricity was out so she had sent the kids to her aunt's apartment, despite knowing that her aunt did not have permission to watch the children while Mother had the children on a monitored return. When CPS retrieved the children, Brooks said they were a little dirty. The foster mother also testified that the children were dirty and that they smelled of body odor.

Mother argues that there is no single specific act or omission that endangered her children. However, drug use and its effect on a parent's life and her ability to parent may establish an endangering course of conduct. *R.W.*, 129 S.W.3d at 739. Likewise, evidence of criminal conduct, convictions, and imprisonment will support a finding that a parent engaged in a course of conduct that endangered the child's well-being. *J.T.G.*, 121 S.W.3d at 133. While imprisonment alone does not constitute a continuing course of conduct that endangers the physical or emotional well-being of a child, it is a fact properly considered on the issue of endangerment. *Boyd*, 727 S.W.2d at 533–34.

The evidence is that Mother has battled drug addiction for at least seven years, and her inability to stay off methamphetamine supports a finding of endangerment. *See J.T.G.*, 121 S.W.3d at 125 (noting that parental drug use supports the conclusion that the children's surroundings endanger their physical or emotional well-being); *see also In re K.W.*, No. 02-09-00041-CV, 2010 WL

144394, at *7–8 (Tex. App.—Fort Worth Jan. 14, 2010, no pet.) (mem. op.) (holding that mother's drug use supported endangerment finding); *In re Z.D.*, No. 02-07-00386-CV, 2008 WL 4354936, at *7 (Tex. App.—Fort Worth Sept. 25, 2008, no pet.) (mem. op.) ("A parent's engaging in illegal drug activity after agreeing not to do so in a service plan for reunification with her children is sufficient to establish clear and convincing proof of voluntary, deliberate, and conscious conduct that endangered the well-being of her children.").

The clear and convincing evidence supports the trial court's finding that the environment provided for the children under Mother's care endangered the physical or emotional well-being of her children. Further, the clear and convincing evidence supports the trial court's finding that Mother engaged in a course of conduct that endangered her children. Accordingly, we hold that the evidence is both legally and factually sufficient to support the trial court's termination findings under subsections 161.001(D) and (E). We overrule Mother's first and second issues.

## II. The best interest finding

In Mother's third issue, she challenges the trial court's finding that termination of her parental rights was in her children's best interest. There is a strong presumption that keeping a child with a parent is in the child's best interest. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). Prompt and permanent placement of the child in a safe environment is also presumed to be in the child's best interest. Tex. Fam. Code Ann. § 263.307(a) (West 2008). The following

13

factors should be considered in evaluating the parent's willingness and ability to provide the child with a safe environment:

(1)     the child's age and physical and mental vulnerabilities;

(2)     the frequency and nature of out-of-home placements;

(3)     the magnitude, frequency, and circumstances of the harm to the child;

(4)     whether the child has been the victim of repeated harm after the initial report and intervention by the department or other agency;

(5)     whether the child is fearful of living in or returning to the child's home;

(6)     the results of psychiatric, psychological, or developmental evaluations of the child, the child's parents, other family members, or others who have access to the child's home;

(7)     whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the child's home;

(8)     whether there is a history of substance abuse by the child's family or others who have access to the child's home;

(9)     whether the perpetrator of the harm to the child is identified;

(10)   the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision;

(11)   the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time;

(12)   whether the child's family demonstrates adequate parenting skills, including providing the child and other children under the family's care with:

　　　　(A)  minimally adequate health and nutritional care;

　　　　(B) care, nurturance, and appropriate discipline consistent with the child's physical and psychological development;

(C) guidance and supervision consistent with the child's safety;

(D) a safe physical home environment;

(E) protection from repeated exposure to violence even though the violence may not be directed at the child; and

(F) an understanding of the child's needs and capabilities; and

(13) whether an adequate social support system consisting of an extended family and friends is available to the child.

*Id.* § 263.307(b); *R.R.*, 209 S.W.3d at 116.

Other, nonexclusive factors that the trier of fact in a termination case may use in determining the best interest of the child include:

(A) the desires of the child;

(B) the emotional and physical needs of the child now and in the future;

(C) the emotional and physical danger to the child now and in the future;

(D) the parental abilities of the individuals seeking custody;

(E) the programs available to assist these individuals to promote the best interest of the child;

(F) the plans for the child by these individuals or by the agency seeking custody;

(G) the stability of the home or proposed placement;

(H) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and

(I) any excuse for the acts or omissions of the parent.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976) (citations omitted).

These factors are not exhaustive; some listed factors may be inapplicable to some cases; other factors not on the list may also be considered when appropriate. *C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may be sufficient in a particular case to support a finding that termination is in the best interest of the child. *Id.* On the other hand, the presence of scant evidence relevant to each factor will not support such a finding. *Id.*

At the time of trial, Nicolas was almost six and Jane was four. Nicolas has been in foster care twice since he was about a year old. The first time, he was in care for nine months. He went back into foster care when he was three years old and remained there for about a year. Jane has been in foster care since she was two years old. *See* Tex. Fam. Code Ann. § 263.307(b)(1)–(2).

Mother admits that she has a drug problem. In the past seven years, Mother claims she had maintained sobriety once for twenty-four months, before Jane was born, and once for five months, from April 2011, until trial. *See id*. § 263.307(b)(3)–(4). Mother has relapsed into drug addiction repeatedly after her first encounters with CPS and has repeatedly refused drug treatment. Mother admitted that her drug problems have made it hard for her to care for her children.

Mother has left her children with Grandmother, with whom she admits she has done drugs. *See id*. § 263.307(b)(8). When she failed the drug test in June 2011, Mother told her caseworker that she thought the positive result was from

sleeping with someone with drugs in their system. Aside from not acknowledging her own drug use, this statement raises concerns that she continues to associate with drug users.

The foster mother testified that Jane made an outcry of sexual abuse and identified Joe as the perpetrator. *See id*. § 263.307(b)(9). The foster mother also testified that Jane had told Mother and that Mother had done nothing to limit Joe's access to Jane. At trial, Mother expressed surprise that Jane had made an outcry.

Mother made appointments with counselors but failed to show. *See id*. § 263.307(b)(10). Mother testified that she no longer had a sponsor in NA because she did not "feel comfortable talking to her after a while." She testified that she similarly had difficultly talking to her counselors because she "get[s] kind of freaked out." She also testified that she has not completed any of the twelve steps.

Mother missed drug tests and appointments with her probation officer. *See id*. § 263.307(b)(11). She failed six drug tests within a five month period. Mother admitted that she put off seeking medical intervention for her depression. Mother told Brooks that she did not want to go to drug treatment "until she could commit to it," and even after the children were removed for the final time, she was not ready to commit. Mother testified that she did not go into drug treatment at that time "because [she] wasn't worried about it." Brooks testified that she

does not believe Mother has made it to the point where she can be considered sober and drug free.

Brooks testified that Mother did appear to take care of the children's basic needs such as food, medical needs, and beds. *See id*. § 263.307(b)(12). She also testified that the house was not filthy, but a little messy. Brooks testified that Mother appeared to be a loving and caring mother, but that sometimes she was unable to follow through.

Mother testified that she did not have any friends or family to help her with transportation or finances. *See id*. § 263.307(b)(13). Although she had worked for her godfather in the past, he did not offer her another position because they "butt[ed] heads." Her stepfather had paid for her apartment, but he no longer does so. There was no testimony that he would pay for another apartment if the children were returned.

Mother acknowledged in her testimony that CPS and the trial court had given her numerous opportunities. CPS returned Nicolas to her after Jane was born, and both children were returned after she was released from state jail. Nevertheless, she has proven that she cannot put the best interests of her children ahead of her issues and problems. At trial, Mother was asked,

> Q. And you've kind of brought yourself up to this position; is that right?
>
> A. Of course, yeah.
>
> Q. You just want to be given the opportunity to fix this, right?

A.  Yeah, pretty much.

Q.  Okay.

A.  And I understand if it's not fixable, you know.  Like, I get that and everything.  But I can't just walk away from my kids, you know.  I'd rather y'all, like, slap me in the face with termination than me just sign them over.

Brooks testified that she believed it was in the children's best interest to terminate Mother's parental rights.  She said that the children are "pretty happy kids now" and have adjusted well to their foster family.  Brooks believes that the foster family is a good placement for the children.  The foster mother testified that she and her husband wanted to adopt the children and said, "We love these kids and we would love to keep them with us."

Giving due consideration to evidence that the trial court could have found to be clear and convincing, and based on our review of the entire record, we hold that a reasonable trier of fact could have formed a firm belief or conviction that the termination of Mother's parental rights would be in the children's best interests.  Accordingly, we hold that there was sufficient evidence to support the trial court's best-interest finding.  We overrule Mother's third issue.

## Conclusion

Having overruled all of Mother's issues, we affirm the judgment of the trial court.

LEE GABRIEL
JUSTICE

PANEL:  LIVINGSTON, C.J.; DAUPHINOT and GABRIEL, JJ.

DELIVERED:  January 12, 2012